**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| **GREGORY SISTRUNK,** *AS ADMINISTRATOR OF THE ESTATE OF WILLIENE SISTRUNK* | **PLAINTIFF** |
| v. | NO. 3:20-CV-406-BJB |
| **CITY OF HILLVIEW, ET. AL.** | **DEFENDANT** |

\*\*\*\*\*

## MEMORANDUM OPINION & ORDER

Williene Sistrunk filed this lawsuit after the Louisville Metro Police Department's SWAT team crashed through the doors of her house in the early morning to execute search and arrest warrants. She was 86 years old at the time. LMPD was assisting Hillview Police officers looking for her grandson, who'd threatened a clerk and robbed a Hampton Inn weeks earlier, making off with $258.78 and the office key. The police didn't find the grandson or any evidence related to his crime. In fact, Sistrunk told them that the suspect didn't live there. Nor had he in the past, despite registering his car and driver's license to that address—the information that led the officers to seek the warrants.

That much the parties agree on. What they dispute are Sistrunk's allegations that she reentered her house after the search to find the doors broken, the house "ransacked," and $77,000 in cash missing from a hidden safe in the living room. After discovery, however, Sistrunk's Estate (she passed in 2022) cannot point to evidence in the record that would support its claims that the search violated the Fourth Amendment. Regardless of the serious and disturbing nature of her allegations, without evidence no reasonable jury could hold the Defendants liable for their actions. So the Court must grant their motion for summary judgment.

### I. The Record

Cedric Alexander, the grandson of Williene Sistrunk, robbed a Hampton Inn on May 3, 2019.[1] Alexander lured the front-desk clerk to the guest bathroom, tackled her to the floor, and threatened to shoot and kill her. Incident Report (DN 28-2) at 5. Because the hotel was in Bullitt County, Detective Boone of the Hillview Police

---

[1] Alexander pled guilty to this robbery in May 2022. *See* Bullitt Circuit Court Action No. 19-cr-286.

1

Department led the investigation. He sent hotel surveillance footage to the Louisville Metro Police Department, which connected those images to photos and past police reports involving Alexander and his car. After receiving this LMPD information on May 16, Boone identified Alexander as his chief suspect. Incident Report; LMPD email & attachments (DN 28-3 to -5). Boone requested, and Judge Potter of the Bullitt District Court signed, an arrest warrant (DN 28-6) on May 29, 2019. This lawsuit doesn't take issue with this account of how law enforcement connected Alexander to the hotel robbery.

Instead it focuses on how law enforcement connected Alexander's case to the home of his grandmother. The day after obtaining the arrest warrant, Boone requested a search warrant for 121 N. 36th Street, where Sistrunk lived and Boone believed Alexander did too. Search Warrant Affidavit (DN 28-7). A different Bullitt District Judge, Rodney Burress, asked Boone how he tied Alexander to the address on the warrant. Boone explained, through a hand-written addition to the warrant application, that "[t]he address listed on the search warrant is the listed address on Cedric Alexander's [driver's license] and the same address the car is registered to." *Id.* Based on Boone's affidavit, as modified, Judge Burress concluded "that there is probable and reasonable cause" to search 121 N. 36th Street, Alexander's Ford Mustang, and Alexander himself. Search Warrant (DN 28-8) at 1. The warrant authorized law enforcement to seize "a Chicago Bulls hat and red or orange t-shirt" and "a gray back pack" that were "worn during [the] robbery," as well as a cash drawer, keys, and money "stolen from the business." *Id.*

The address from Alexander's license and vehicle registration was in Louisville proper, not Hillview—a small city nearby in Bullitt County. Under Hillview Police protocols, this meant Louisville Metro Police had to execute the warrant before Hillview officers could conduct the search. Boone Depo. (DN 26-2) at 42, 67–68. Based on LMPD's surveillance of the house and Alexander's apparent use of a firearm during the Hampton Inn robbery, LMPD decided a SWAT team was necessary to execute the warrant. *Id.* at 68–69. Hillview Police conducted its own risk assessment and reached the same conclusion. Risk Assessment Matrix (DN 28-10).

The police executed the search warrant just before dawn on May 31, 2019. The LMPD SWAT team battered in the front, back, and basement doors before clearing the house. Boone Depo. at 69–70; Sistrunk Depo. (DN 26-1) at 18–19. But Alexander wasn't there. Sistrunk was, along with a son and great-grandson who lived with her. She was talking on the phone in her bedroom a few steps from the front door when police officers "covered in … military get-up" crashed through the door. Sistrunk Depo. at 16, 18. One pointed a shotgun at her, motioned for her to raise her hands, and directed her outside without giving her the chance to get dressed. *Id.* at 18–19. Sistrunk left through the front door and stayed with the Hillview officers near the SWAT vehicle until the LMPD turned over the scene. *Id.* at 16–19, 25–26. Although

2

Sistrunk was never restrained, her son and great-grandson were handcuffed and held during the LMPD sweep. Cruz Body-Worn Camera Video (DN 28-11) at 0:35–14:40.

Once LMPD gave the all-clear, Hillview Police took the handcuffs off the son and great-grandson, escorted everyone back into the house, and looked for Sistrunk's dog ("Handsome"), which had gone missing during the sweep. Boone Depo. at 73, 79–80; Cruz Body-Worn Camera Video. Hillview Police officers—including Boone, Lieutenant Charles McWhirter, and Emily Cruz—then searched the house for evidence of the hotel robbery.

During the search—which turned up no evidence related to the crime—Boone sat with Sistrunk in her living room, read the search warrant to her, and explained that the HPD was looking for her grandson. Boone Depo. at 74; Sistrunk Depo. at 20. Sistrunk responded that Alexander did not live with her but used her address to receive mail. Sistrunk Depo. at 9–10. Before Boone left, Sistrunk thanked him for taking the time to explain things to her. Boone Depo. at 74–75.

### II. This Litigation

Sistrunk later sued the City of Hillview, Detective Boone, Lieutenant McWhirter, the Louisville Metro Government, and Unknown Louisville Metro police officers in state court for infringing her Fourth Amendment and state constitutional rights, committing several common-law torts, and violating Kentucky's official-misconduct statute (Ky. Rev. St. § 522.020, made potentially actionable by § 446.070). Complaint (DN 1-2) ¶¶ 21, 25–36, 40–48. Louisville Metro removed the suit and moved to dismiss the claims against it. DNs 1, 4. The Court granted Louisville Metro's motion to dismiss the *Monell* policy-or-custom claim without prejudice and granted its motion to dismiss the punitive and state-law claims with prejudice. DN 11. Sistrunk subsequently abandoned her claims against the unknown LMPD officers, DN 13, and has not amended her complaint to replead her municipal-liability claim against Louisville Metro.

Sistrunk sought and received discovery against Boone, McWhirter, and the City of Hillview, which hadn't moved to dismiss. In November 2022, Sistrunk passed away. Three months later, these three remaining defendants moved for summary judgment. DN 28. In accordance with Rule 25(a)(1), Sistrunk's son Gregory moved to substitute the Estate (which he administers) as the plaintiff. DN 31. The Court granted the motion to substitute, DN 32, and the Estate subsequently filed its response to the summary-judgment motion, DN 33.

### III. Abandoned Claims

In response to the motion for summary judgment, the Estate abandoned all but two of its claims. It expressly dropped all claims against McWhirter, Response at 2 n.2, as well as claims against Boone for intentional infliction of emotional

distress, battery, official misconduct, "outrage," and violations of the state constitution, *id.* at 12 n.4.

The Estate also implicitly dropped its § 1983 claims for property destruction and theft by not opposing Boone's motion for summary judgment on those claims. The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). The Estate's response addressed only the warrant and risk-assessment matrix, neither of which related to Boone's responsibility (or lack thereof) for the alleged destruction or theft of Sistrunk's property. Response 4–9. To hold Boone liable for the alleged damage to the "doors, gate, clothes, and vehicle" or the alleged theft of cash from her living-room safe, Response at 3, the Estate would need to show that Boone was not "[m]ere[ly] presen[t] at the scene of a search," but rather bore "direct responsibility for the action[.]" *Bey v. Falk*, 946 F.3d 304, 315 (6th Cir. 2019). He wasn't—at least not based on anything in the portions of the record identified by the parties. FED. R. CIV. P. 56(c). Indeed, the body-camera footage appears to show him waiting outside the house with Sistrunk, escorting her back into the house, and then sitting on a sofa speaking with her. *See* Cruz Body-Worn Camera Video at 0:48–14:38; 15:21–32:00. So Boone apparently had no opportunity to either "ransack" her house or steal the money from her safe, and the Court grants judgment on these claims, too. *See, e.g.*, *Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011).

And because the Estate did nothing more than refer to the pleadings to support the claims for conversion, trespass to chattel, and false imprisonment, it has effectively abandoned those as well. The Sistrunk Estate insists that it "has properly plead[ed] her state law claims of false imprisonment, conversion, and trespass to chattel[.]" Response at 12. But that is not enough to survive a motion for summary judgment. *See Nat'l Solid Wastes Mgmt. Ass'n v. Voinovich*, 959 F.2d 590, 592 (6th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Boone has carried his "initial burden of showing that no genuine issues of material fact remain in dispute" on the trespass and conversion claims by pointing to record evidence that he stayed with Sistrunk during the search, didn't break down the doors with LMPD, and lacked any opportunity to crack the safe. Motion at 16–17. This shifts the burden to the Estate, which cannot carry it by citing allegations rather than evidence. *See, e.g.*, *Voinovich*, 959 F.2d at 592. And the false-imprisonment claim fails because "innocent bystanders" such as Sistrunk "may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." Motion at 17 (quoting *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011)). Nothing in the Estate's response suggests officers detained Sistrunk beyond the time necessary "to secure the scene."

4

### III. Disputed Claims

That leaves only two claims: a § 1983 claim against Boone for obtaining a warrant without probable cause and a related claim against Hillview for a practice of "inadequate training" and a "custom of tolerance or acquiescence in search warrants being obtained on residences without probable cause." Response at 9. At the summary-judgment phase, the Court views all record evidence in the light most favorable to Sistrunk and looks for any "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

#### A. Officer Boone

The Estate argues that Boone (1) misled the magistrate into concluding that probable cause for the search existed and (2) unreasonably relied on the judge's assessment of probable cause to conduct his search. Response at 6. But because Boone has invoked qualified immunity, the Estate bears the burden of overcoming that defense. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) ("Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity."). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). "The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). So unless the Estate's "allegations state a claim of violation of clearly established law," Boone is entitled to qualified immunity. *Mitchell*, 472 U.S. at 526.

**1. Pre-Warrant Conduct.** Did Boone mislead the judge by "knowingly, or in reckless disregard for the truth, … omit[ting] the truth in [his] search warrant affidavit"? Response at 6 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). The "truth" that Boone should have included in his affidavit, argues the Estate, was "the fact that Mr. Alexander did not live with [Ms. Sistrunk] and never did." Complaint ¶ 28. Failing to investigate whether Alexander lived at the target address—while instead relying on the address provided on Alexander's driver's license and vehicle registration—amounted to reckless disregard of the truth, according to the Response (at 4–6). Boone "utterly failed to establish any link between the Residence and commission of the crime and did not even determine if the suspect lived in the residence or who else lived there, much less if the suspect ever visited the house." *Id.* at 7.

5

The Sixth Circuit has "distilled a specific inquiry" for Fourth Amendment claims that officers lied to or misled a magistrate in a search-warrant application. *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019); *see also Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003) (applying the same "specific inquiry" later described in *Butler* to "allegedly false or omitted information" that is "material to [a] finding of probable cause").[2] "'To overcome an officer's entitlement to qualified immunity,' a § 1983 plaintiff must make 'a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth.'" *Id.* (quoting *Vakilian*, 335 F.3d at 517.) In the context of a material *omission*, the Estate "must make a strong preliminary showing 'that [Boone] *with an intention to mislead* excluded critical information from the affidavit[.]'" *Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005) (quoting *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998)) (emphasis in original). The upshot is that "[p]roof of negligence or innocent mistake is insufficient." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999) (internal quotations and citations omitted).

The Estate doesn't argue—at least not expressly—that Boone outright fabricated information on his warrant affidavit or omitted material information he knew at the time. Instead it argues that he showed reckless disregard for the truth: "Boone admitted that he conducted no surveillance and never searched utility or property records"—choosing, rather, to rely on the information from Alexander's license and registration. Response at 7. Boone should've done more, according to the Estate, to corroborate the information on the warrant affidavit by investigating whether Alexander actually lived with his grandmother. The Response also lists a

---

[2] Qualified immunity is warranted, according to the officers, because in their view they didn't violate clearly established law. Reply at 5. But the Sixth Circuit has held that "[a] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999)); *see also Frontczak v. City of Detroit*, 2021 WL 4440332, at *5 n.6 (E.D. Mich. Sep. 28, 2021) ("It is 'clearly established' that a police officer cannot purposefully make a materially false statement in securing a warrant.") (citing *Rieves v. Town of Smyrna*, 959 F.3d 678, 695 (6th Cir. 2020)). The only question, then, is whether a reasonable jury could conclude based on record evidence that Boone purposefully made a false statement or material omission in his warrant affidavit. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) ("[Q]ualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees *or* (2) the guarantee, even if violated, was not "clearly established" at the time of the alleged misconduct." (citing *Pearson*, 555 U.S. at 232) (emphasis added)).

6

number of errors Boone purportedly made in completing a Risk Assessment Matrix related to the use of the SWAT team. *Id.*[3]

The Estate's critiques of Boone's investigation, however, don't amount to reckless disregard for the truth under Sixth Circuit precedent. An "investigation's lack of thoroughness might support an inference of negligence, but it does not demonstrate knowing or intentional behavior designed to violate [a plaintiff's] constitutional rights." *Ahlers*, 188 F.3d at 373–74. Evidence "support[ing] at most a finding of incompetent or negligent investigation … is insufficient to establish a constitutional violation." *Seigel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001); *see also Lewis v. Perkins*, 2022 WL 987942, at *5 (E.D. Ky. March 31, 2022) (similar).

As other judges have noted, the Sixth Circuit's caselaw "appear[s] to equate reckless disregard for the truth with knowing or intentional behavior." *Clark v. Miller*, No. 2:16-cv-69, 2016 WL 4703828, at * 4 (E.D. Tenn. Sept. 8, 2016) (citing *Ahlers*, 188 F.3d at 373–74). "Implicit in [this] demanding standard is the recognition that a police officer swearing out an affidavit can make mistakes and yet remain protected by qualified immunity. To overcome this immunity, a plaintiff must present 'substantial' evidence to show a more culpable mental state." *Butler*, 936 F.3d at 418. In *Ahlers*, for example, an inmate accused a corrections officer of sexual assault, and the state police sent an investigator to take over the case from local law enforcement. 188 F.3d at 367–68. The state investigation was woefully inadequate, yet the investigator recommended charges in a bare-bones affidavit. *Id.* The case against the officer fell apart almost immediately. *Id.* This shoddy investigation was not enough to render the sheriff's department and state investigator liable, however: although the "Defendants failed to gather evidence, failed to interview witnesses at the scene, failed to view the scene, and failed to reconstruct the alleged event," this

---

[3] To the extent the Estate relies on the Matrix to show reckless disregard for the truth, the errors it describes do not rest on any information Boone misrepresented or ignored. The Response (at 6) asserts that "Boone misrepresented and/or recklessly filled out the Risk Assessment Matrix." But it doesn't cite anything in the record indicating Boone's answers on the assessment were not just wrong, but culpable. And mistakes alone are obviously not enough to establish culpability under the law of the Sixth Circuit. *Ahlers*, 188 F.3d at 373–74.

To the extent the Estate relies on the Matrix to show Boone caused the SWAT team to damage Sistrunk's home, it fails to connect the team's involvement to the probable-cause determination or any other constitutional violation. *See* Reply at 8 (Estate "cannot establish a nexus or proximate cause between Boone's preparation of the matrix and the violation of a constitutional right"). Nor does the Estate address the uncontroverted evidence indicating that LMPD decided to use SWAT independent of Boone's assessment. *See* Boone Depo. at 42, 58, 67–68.

was "[a]t best … negligence" because it "d[id] not demonstrate knowing or intentional behavior designed to violate [the plaintiff's] constitutional rights." *Id.* at 373–74.

So too here. The Estate's Response (at 7) contends that Boone "utterly failed to establish any link between the Residence and commission of the crime and did not even determine if the suspect lived in the residence or who else lived there, much less if the suspect ever visited the house." Even accepting that view of the record, the Estate points to no evidence of "knowing or intentional behavior *designed* to" violate Sistrunk's rights through a recklessly wrong search warrant. *Ahlers*, 188 F.3d at 374 (emphasis added). The Estate has not shown—or even alleged—that Boone acted with an intent to deceive. Response at 7.[4] Nor has it alleged that Boone knew anything at all that he omitted from the affidavit. So the Estate's criticisms of the investigatory methods and omissions—the supervisor's failure to review or approve the affidavit, and Boone's "admi[ssion] that he conducted no surveillance and never searched utility or property records"—falls short of the Sixth Circuit's requirement of the "more culpable mental state" required to show reckless disregard for the truth. This entitles Boone to qualified immunity. *See Butler*, 936 F.3d at 418.

**2. Post-Warrant Conduct.** Even if Boone isn't liable for his actions in obtaining the warrant, is he nevertheless liable because he relied on it? The Estate says yes: his reliance was unreasonable because the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Response at 6 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). But the Estate must clear a high bar on this point because "[t]he question … is not whether the Magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the Magistrate so obviously erred that any reasonable officer would have recognized the error." *Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012). Qualified immunity protects the officer from liability unless "the warrant is so lacking in indicia of probable cause[]

---

[4] The Estate hints at bad faith by arguing that Boone violated HPD policy by failing to seek a supervisor's review of the affidavit, to search public records, or to conduct additional surveillance. Response at 7. But this inference rests on a misreading of HPD's policies which apply to *executing* rather than securing a warrant. *See* Hillview Policy 1.4A (DN 33-7) at § 7(F) ("Prior to the execution of the warrant, all available data bases will be checked to ensure that the residence matches the suspect of the investigation."); Hillview Policy 18.2 (DN 33-6) at § 2(C)–(D) ("Before deployment of the specialized tactical unit, an operational planning session shall be conducted and must include … [a]cknowledgment that current surveillance of the targeted location has been done [and] [i]dentification of the subjects believed to be present at the targeted location."). Neither the Complaint nor the Response contends the execution of the search warrant, assuming it had been properly obtained, violated the Fourth Amendment.

that official belief in the existence of probable cause is unreasonable." *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018).

Was Boone's reliance on the warrant unreasonable based on the attenuation between Sistrunk's house and evidence of Alexander's crime? The Estate draws on a series of (mostly out-of-circuit) rulings that suppressed evidence found in a suspect's home because the warrant affidavit did not adequately "lin[k] the person's home to the suspected criminal activity." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999) (affidavit based on confidential informant's belief that suspect "maintained a quantity of crack cocaine at his residence" despite never selling from his residence); *see also United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016) (rejecting the position that defendant's status as "a known drug dealer," standing alone, sufficed to "infe[r] that drugs will be found in the defendant's home"); *United States v. Trujillo*, No. 03–40134, 2004 WL 813645, at *4 (D. Kan. March 8, 2004) (affidavit failed to establish probable cause to search drug-dealing suspect's father's home based on dealer spending "a lot of time" there). Contrary to the Estate's suggestion, these decisions do not categorically insist on evidence directly tying a suspect's home to his or her crime. Response at 5. Rather, they illustrate the fact-intensive and context-specific nature of this inquiry.

Many courts—including the Sixth Circuit—have confronted similar facts and held reasonable the "infer[ence] that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008) (firearms used in a robbery are "likely to be kept in a suspect's residence"); *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (similar); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("It was reasonable for the magistrate to believe that the defendant's gun and silencer would be found in his residence … even though the affidavit contains no facts that the weapons were located in the defendant's trailer."); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (finding "little reason to believe that any of the [robbed] bank's money ... would still be in the home," but "the same could not be said of the revolver"); *Bastida v. Henderson*, 487 F.2d 860, 861–63 (5th Cir. 1973) (affirming a magistrate's finding of probable cause to search a suspect's residence for a gun used in an armed robbery). Indeed, the Sixth Circuit has explained that "a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence." *Peffer*, 880 F.3d at 271. Because the affidavit relayed that Alexander told the Hampton Inn clerk that "he[] would shoot and kill her," DN 33-3 at 2, Judge Burress could reasonably conclude (consistent with the caselaw described above) that evidence of Alexander's crime could be in his home.

But of course 121 N. 36th Street was *not* Alexander's home; it belonged to his grandmother. Did Judge Burress (and Boone) unreasonably infer that Alexander lived at the address listed on his license and registration? The Estate says yes

because "people, particularly younger people who move frequently, often use addresses of relatives as permanent addresses or addresses for mailing purposes, despite rarely visiting the location." Response at 6. The Estate doesn't cite any legal or empirical authority for this proposition. Of course any of us might live at and list different addresses. Is that enough to "clearly establish" the unreasonableness of a court's (or police officer's) reliance on that address to indicate where evidence of a crime might be found? Not according to the precedents that define the contours of "clearly established" law; the limited caselaw on this issue (none of it cited by the parties) cuts the other way. In *United States v. Campbell*, for example, the Tenth Circuit treated verification of suspect's address through driver's license records as sufficient to show the "indicia of probable cause" necessary to justify reliance on a warrant. 603 F.3d 1218, 1232 (10th Cir. 2010). And in *United States v. Gumbs*, the Third Circuit treated the address on a driver's license as "a reliable indicator of [a suspect's] residence" upon which law enforcement can rely "without further corroboration." 562 F. App'x 110, 114 (3d Cir. 2014). Falsifying an address on a driver's license application or renewal is illegal, after all. *See* Ky. Rev. St. § 186.610(5). And Alexander had renewed his license *the day before* he robbed the Hampton Inn. His vehicle registration listed the same address. Aside from conjecture about young persons' mercurial living arrangements, the Estate offers no countervailing evidence that Boone should've suspected that the address on Alexander's license and registration was stale or wrong.

All told, the Estate has not pointed to anything in the record or caselaw that would lead a reasonable jury to conclude that Judge Burress's finding of probable cause was unlawful or the search of Sistrunk's house unconstitutional. Therefore the Court cannot conclude that Judge Burress "so obviously erred" in finding probable cause that "any reasonable officer would have recognized the error." *Millender*, 565 U.S. at 556.

### B. City of Hillview

For the same reasons, the inadequate-training claim against the City of Hillview fails. Because no reasonable jury could find that Boone (the only Hillview officer still in this case) violated Sistrunk's constitutional rights, as a matter of law and logic Hillview could not have *caused* its agent to commit a nonexistent violation. A municipality "may be held liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694–95 (1978)). This would require the Estate, in order to recover, to "point to a municipal 'policy or custom' and show that it was the 'moving force behind the constitutional violation.'" *Monell*, 436 U.S. at 694. But here the Estate doesn't get that far: it has failed to establish any constitutional violation, so the analysis doesn't go any further. "There can be no liability under

10

*Monell* without an underlying constitutional violation." *Lucas*, 753 F.3d at 622 (affirming dismissal of *Monell* claims based on qualified immunity of municipal officers).

Summary judgment would be warranted even if Boone were liable for violating Sistrunk's Fourth Amendment rights. The Estate's evidence tying any such violation to city policy wouldn't support a finding that Hillview had a practice of constitutionally "inadequate training" or a "custom of tolerance or acquiescence in search warrants being obtained on residences without probable cause." Response at 9. The Estate doesn't contend the municipality offered no training at all, and fails to explain how a lack of *mandatory* post-hiring training on search warrants or risk assessments (a characterization the defense disputes, *see* Reply (DN 34) at 13) "undoubtedly caused [a] constitutional violation." Response at 11. *See, e.g.*, *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023) ("[E]ven construing the record in Harris's favor, no reasonable juror could find the City *completely* failed to provide *any* type of probable cause training in light of the police chief's unchallenged testimony." (emphasis in original)).

Nor does the Estate point to any incidents besides the disputed search at issue here that suggest Hillview explicitly or implicitly condoned a custom of searches in violation of the Fourth Amendment. Although the Estate is correct that in some extreme circumstances a pattern of constitutional violations isn't required, *see* Response at 10 (citing *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020)), the allegations (much less the evidence) don't approach that level of municipal culpability, *compare Ouza*, 969 F.3d at 286 (defendant allegedly "did not provide *any* training," "never conduct[ed] performance evaluations," and "di[d] not otherwise supervise its officers' conduct"). And decisions within this Circuit regularly conclude that far more incidents than identified here nevertheless fall short of the *Monell* standard. *See, e.g.*, *Cretacci v. Hare*, No. 21-5786, 2022 WL 17176781, at *9 (6th Cir. Nov. 23, 2022) ("[T]hese three incidents, taking into account the full picture, are simply insufficient to demonstrate that the County has a clear and persistent pattern of violations [because] [t]hey do not give rise to the inference that the County has a custom so permanent and well settled as to constitute a custom or usage with the force of law of ignoring claims comparable to Cretacci's." (internal quotations and citations omitted)); *Wallace v. Coffee County*, 852 F. App'x. 871, 876 (6th Cir. 2021) (six incidents insufficient to establish custom).

## ORDER

The Court grants the motion for summary judgment (DN 28).

Benjamin Beaton, District Judge
United States District Court

September 26, 2023

11